## CONNER v. CITY OF NEVADA, Appellant.

**Division One, March 30, 1905.**

1. **CITIES: Liability for Negligence: Maximum Indebtedness.** The Constitution, in fixing a maximum tax rate for the current expenses of a city and providing that the city shall not become indebted in any manner except upon consent of two-thirds of its inhabitants, does not relieve a city of the burden of paying for injuries received by a pedestrian on its streets due to the negligence of the city in permitting the street to remain in an unsafe condition. That clause refers to debts which arise *ex contractu.*

2. ———: ———: ———: **Debts.** The Constitution in referring to the incurring of an indebtedness refers to an indebtedness incurred by assent, agreement or contract. It does not refer to a liability for tort, which, in law, is to be distinguished from a debt.

3. ———: **Ministerial Duties: Liability.** A municipal corporation is not liable for dereliction of a governmental duty, but it is liable for failure to perform a ministerial duty, such as the keeping of its streets in a reasonably safe condition for the use of travelers.

4. ———: **Maximum Indebtedness: Torts.** A city can not escape liability from an obligation arising *ex delicto* on the ground that its indebtedness had already reached the maximum constitutional limit.

5. ———: **Public Street.** The obligation of a city to keep a street in repair does not attach until the corporation, in some official and appropriate manner, invites or sanctions its use as a street by the public. But that corporate sanction is made to appear by a showing that the street has been graded and curbing put in and a sidewalk constructed, under the immediate supervision of the street commissioner.

Conner v. Nevada.

6. ————: ————: **Acts of Officials: Evidence.** Parol proof that a certain act appertaining to a particular public office was done by a man in possession of the office, acting in his official capacity, is competent evidence to show, prima-facie, that the act was official. And so the parol testimony of a witness that he was a street commissioner at the time a sidewalk and curbing gutter were constructed and as such supervised and directed the work to be done, is competent evidence that he was at the time street commissioner.

7. **CONTRIBUTORY NEGLIGENCE.** Unless the course the pedestrian might have taken was obviously the only prudent thing to do, the fact that, in view of her subsequent injury, she might have taken another course and in that way have avoided the accident will not authorize the court to declare, as a matter of law, that she was guilty of contributory negligence.

8. **NEGLIGENCE: Injury: Subsequent Acceleration.** It is the duty of a person who has been injured through the negligence of another to use reasonable care to promote a recovery from the injury; yet, if she is guilty of no negligence in this respect, and an accident happened to her in which the result was more serious because of her then condition as a result of the previous injury than it would have been had she not already been injured, such additional injury in reality becomes the result of the first injury.

9. ————: ————: ————: **Excessive Verdict: $3,000.** The plaintiff, a married woman, while walking along a street, fell into a hole which the city had negligently permitted to exist, and received severe injuries. Her leg was broken, her ankle dislocated, and while subsequently riding in a buggy with her husband before the broken bone had united, the wheel broke down, and the broken bone received a jar, and the broken joint slipped a little, but there was nothing in the evidence to indicate that she was guilty of any imprudence in taking that ride. She was bedridden most of the time for ten months, and at the time of the trial was still suffering, and the expert testimony was that she would always suffer. *Held,* that a verdict of $3,000 was not excessive.

Appeal from Vernon Circuit Court.—*Hon. H. C. Timmonds,* Judge.

AFFIRMED.

*J. B. Johnson* and *A. J. King* for appellant.

(1) Defendant is not primarily liable in this action. Secs. 11 and 12, art. 10, Constitution. (2) The intention of the Constitution was to put municipalities such as defendant upon a cash basis absolutely. Book v. Earl, 87 Mo. 252; Barnard & Co. v. Knox Co., 105 Mo. 386; Andrew Co. v. Schell, 135 Mo. 38; State v. Payne, 151 Mo. 669; Railroad v. Thornton, 152 Mo. 574; State v. Johnson, 162 Mo. 629; State v. Railroad, 169 Mo. 574. (3) The fact that the Supreme Court has heretofore assumed that cities and towns are liable in actions of this kind should cut no figure. State v. Thayer, 158 Mo. 48; Hunt v. Searcy, 167 Mo. 178; Ex parte Carter, 166 Mo. 604. (4) The power to open, improve and to have full control of streets is conferred upon the city, but such power can only be exercised by ordinance. R. S. 1899, sec. 5858; City of Unionville v. Martin, 95 Mo. App. 36. (5) Until the city does so take jurisdiction and control of a street it is not liable for failure to maintain and keep it in repair. Downend v. Kansas City, 156 Mo. 60; Carl v. DeSoto, 156 Mo. 443; Hunter v. Weston, 111 Mo. 176; Moore v. Cape Girardeau, 103 Mo. 470. (6) An ordinance can be proved only by the journal of the council or the ordinance itself, parol testimony being admissible only where proper foundation is laid. Stewart v. Clinton, 79 Mo. 611; Lebanon Light Co. v. City of Lebanon, 163 Mo. 254. (7) The demurrer to the evidence should have been sustained. Holding v. St. Joseph, 92 Mo. App. 143; Ely v. St. Louis, 81 S. W. 168. (8) Refused instruction 11 asked by defendant should have been given. Smart v. Kansas City, 91 Mo. App. 592; Bank v. Railroad, 98 Mo. App. 330; Warner v. Railroad, 178 Mo. 125; Oglesby v. Railroad, 177 Mo. 302; Epperson v. Railroad, 155 Mo. 382. (9) The verdict is excessive and is plainly the result of passion and prejudice. Chitty v. Railroad, 166 Mo. 443.

*Scott & Bowker* for respondent.

(1) Municipal corporations being invested with the exclusive control over the highways within their limits, and having ample power to raise money for their construction and repairs, it is their duty to keep their highways in a reasonably safe condition, for failure to perform which they are subject to a corresponding liability. 15 Am. and Eng. Ency. Law (2 Ed.), 420. (2) Even in those States having constitutional limitations as to the indebtedness of cities, it has always been held that a city can not escape liability for an obligation arising *ex delicto* on the ground that its indebtedness had already reached the constitutional limitation. 20 Am. and Eng. Ency. Law (2 Ed.), 1173. (3) While it is necessary, in order to make a city liable for the care of its streets, to prove an acceptance of the street for the use of the public, in addition to the dedication thereof, such acceptance may be shown by the acts of its proper officers, as well as by acts in the form of ordinances. Baldwin v. Springfield, 141 Mo. 205; Meiners v. St. Louis, 130 Mo. 274; Downend v. Kansas City, 156 Mo. 60; Johnson v. St. Joseph, 96 Mo. App. 663; O'Malley v. Lexington, 99 Mo. App. 695; Golden v. Clinton, 54 Mo. App. 100. (4) The court did not err in overruling appellant's demurrer to the evidence, as it was certainly a question for the jury to pass upon as to whether the city had accepted said street and whether the defect complained of was negligence on the part of the city, and also as to whether plaintiff was negligent or not. Durrell v. St. Joseph, 82 S. W. 1130; Halpin v. Kansas City, 76 Mo. 335; Brennan v. St. Louis, 92 Mo. 482; Baldwin v. Springfield, 141 Mo. 205; Bassett v. St. Joseph, 53 Mo. 290; Barr v. Kansas City, 105 Mo. 550; Vogelsang v. St. Louis, 139 Mo. 127. (5) Parol testimony is admissible to prove that an officer is such. Proof that he has acted as such is sufficient to raise a presumption that he has been legally appointed,

in the absence of evidence to the contrary. Underhill on Evidence, sec. 36; Hart v. Bobinett, 5 Mo. 17; Eads v. Wooldridge, 27 Mo. 251; North v. People, 28 N. E. 956; City v. Row, 46 N. W. 872.

VALLIANT, J.—The substance of the plaintiff's petition is that, on the night of July 17, 1901, while she was walking along one of the public streets of the defendant city exercising ordinary care, she fell into a hole that defendant had negligently allowed to be in the street; and received severe personal injuries. The answer was a general denial and a plea of contributory negligence. The trial resulted in a verdict and judgment for the plaintiff for three thousand dollars from which defendant appealed.

I. The first point presented in the brief of appellant is that under the terms of sections 11 and 12 of article 10 of the Constitution, the defendant, a city of the third class, is not liable in this kind of an action. The proposition is that section 11 puts a limit on the rate of taxes that may be levied in such cities for city purposes, and section 12 puts a limit on the amount of indebtedness which the city may incur, forbidding the incurring in one year indebtedness to an extent in the aggregate beyond the revenue to be derived from the taxes of that year. The argument is that the tax rate was limited to produce only sufficient revenue to meet the necessary expenses of the city, and the incurring of all liability beyond that was forbidden, and that this, by necessary implication, makes it unlawful for the city to incur liability for its acts of negligence, because liability of that kind is indefinite and in a sense un-limited.

Appellant concedes that in numerous cases that have come before the courts of this State since cities have been limited by the Constitution in their power to incur indebtedness, they have been held liable in dam-

ages when they have wrought injury by neglect of duty, but insists that the courts in so holding have passed in silence over the point now raised and that it has not been decided.

The clause of the Constitution in question deals with the subject of incurring indebtedness which arises *ex contractu* and which is very different in its nature from suffering liability for a tort. The language of section 12 is that the city shall not be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose. This language shows that it is indebtedness incurred by assent, agreement or contract. The word debt has a well recognized meaning in law distinguished from liability for damages. After a claim for damages is reduced to a judgment it becomes, in a technical sense, a debt, but it is a debt imposed by law, not one assumed by contract. What our Constitution aims to control is the action of the municipal corporation in the matter of contracting debts. For definition and discussion of the term "debt" see 13 Cycl. Law and Proc., pages 393 and following, and cases cited in the notes.

In 1 Smith on Mun. Corp., secs. 4, 5, 6, the author divides public corporations into two classes, municipal corporations and public *quasi* corporations, and to these he adds a third class, *quasi*-public corporations. The first includes incorporated cities, towns and villages; the second, counties, townships, school districts, etc., and the third railroad, grain elevator, telegraph companies, etc. The generic difference between the two first, the author says, lies in the fact that cities, towns and villages are created at the request, or at least with the consent, of their members and for their benefit, while public *quasi* corporations are mere local subdivisions of the State created by the sovereign will,

to exercise certain duties in aid of the State government, and inasmuch as the sovereign is not liable for neglect of duty the *quasi*-public corporation acting for the State is not liable unless. made so by statute, but that municipal corporations to whom are given certain powers to be exercised for the benefit of its inhabitants, in the doing of acts which the State does not do, are liable for the consequences of neglect of duty in the performance of those acts. The author also points out the distinction between acts of a municipal corporation in the discharge of its delegated governmental authority and these in the discharge of its ministerial duty, holding that in the first the city is not liable for dereliction, and in the second it is. In a note to the text, section 6, n. 20, the author says: "The rule stated briefly seems to be, that where a municipal corporation acts for a purpose purely and essentially public—acts as an agent for the State, and nothing more—the corporation is regarded as a part of the sovereign State, and cannot be sued for a tort, unless express permission by statute to bring such a suit has been given. But where municipal corporations act, as private corporations, for the local benefit and advantage of their members, they are liable in tort just as a private corporation would be."

In a very thoroughly-considered case on this subject the Supreme Court of Texas, after citing the leading authorities, English and American, shows that the accepted rule of law is that for neglect of duty in a matter of the kind then under consideration (failure to keep a street in reasonably safe condition), the city is liable in an action of tort, not by force of any statute, but by the common law. [City of Galveston v. Posnainsky, 62 Tex. 118.]

The distinction between municipal corporations and what are above referred to as public *quasi* corporations in respect of their liability for neglect of duty is

pointed out in 15 Am. and Eng. Ency. Law (2 Ed.), pp. 420, et seq.; also 2 Dillon on Mun. Corp. (4 Ed.), sec. 996, et seq.]

Reasoning along the lines above referred to we see that the liability of a city for allowing streets to remain so out of repair for an unreasonable time as to render them unsafe for use is a liability imposed by law; it does not depend on contract, it is not in the technical sense a debt. Then when we turn again to the clause in our Constitution on which appellant relies we see that it refers only to the contracting of debts, and makes no reference to liability for torts, it leaves that matter as the common law left it.

In 20 Am. and Eng. Ency. Law (2 Ed.), p. 1173, it is said: "A city cannot escape liability from an obligation arising *ex delicto* on the ground that its indebtedness has already reached the constitutional limit." And in a note to the text the author cites: McCracken v. San Francisco, 16 Cal. 591; People ex rel. v. May, 9 Colo. 404; Bloomington v. Perdue, 99 Ill. 329; Chicago v. Sexton, 115 Ill. 230; Bartle v. Des Moines, 38 Iowa 414; Rice v. Des Moines, 40 Iowa 638; Dallas v. Miller, 7 Tex. Civ. App. 503.

Thus it will be seen that the question now presented, although perhaps not heretofore expressly decided in this State, has received judicial consideration in other States which have similar constitutional limitations, and so far as the decisions have come to our notice they hold that for a neglect of duty of the kind now in question the city is liable even though it has reached the limit of its power to levy taxes and contract debts.

It is not necessary to refer to any of the many cases in which we have held cities liable in such case without referring to the constitutional limitations referred to, because, as the learned counsel say, the constitutional question was not discussed, but now that our attention is expressly called to it we see no reason to

take back anything that we have heretofore said on the subject of the city's liability for its negligence in failing to keep its streets in reasonably safe condition for use by the public. We hold that there is nothing in our Constitution to limit that liability.

II. We come now to a consideration of the case on its merits.

The evidence for the plaintiff tended to prove as follows:

The plaintiff, a married woman, was comparatively a stranger in the city of Nevada. About two weeks before the accident, she was passing through the city and stopped to spend one night with a friend; the next morning she was driven by her friend's husband in a buggy to the Union Depot along the street in which she afterwards met with the accident. Two weeks later she returned to the city, arriving at the Union Depot, July 17, 1901, about 9 o'clock in the evening. She made inquiries of some persons standing at the depot for a conveyance of some kind to take her to her friend's residence, but finding no such conveyance, she undertook to walk there.

The railroads passing the Union Depot on the east side run through the city north and south; there are about nineteen tracks. The business part of the city lies west of the depot, but the corporate limits extend about a half mile east of the same. The streets leading east from the business part of the city towards the Union Depot terminate at the railroad tracks, except two, Locust street and Austin street, which, going east, cross the tracks and extend a half mile to the east limits of the city; at the east city limits, Austin street extended becomes the county road. Austin street is one block south of the Union Depot, and Locust street is four blocks north of Austin. People living in the city east of the railroad tracks had to use either Austin or Locust street in going to or from the principal part of

the city or the Union Depot. At the date in which we are now interested, Austin street was and had been for many years an open public thoroughfare. The city had caused it to be graded, gutter ditches on the sides made, and raised in the middle for a wagon road. On the north side of the street the city had constructed for a sidewalk a cinder path, but with wear and lack of repair it had become unfit for use, and the public, walking along the street, had fallen into the habit of walking along the north side of the wagon track, and a beaten path for pedestrians was well marked there by use. This path was on the south side of the gutter ditch, which had separated the cinder path from the wagon road. Some years before this accident the city had by ordinances granted one of the railroad companies a license to lay two switch tracks across the street about 250 feet east of the depot, and the railroad company in its construction had made a wooden culvert under its tracks, extending beyond them five feet east, to carry off the water which came down a ditch along the west side of the switch tracks. At the east end of this culvert a hole had washed out about four feet deep and four or five feet wide, and had been there for several months before the accident. The beaten path above mentioned led directly across the switch tracks to this hole; the hole lay right in the way of one walking along the path. The people who knew of its existence were in the habit of following the path until the hole was reached and then turning to the right.

This was the condition of the street on the night when the plaintiff landed at the Union Depot and started to walk to the residence of her friend, and this street was the most direct route for her to take.

The plaintiff, with a two-year-old infant in her arms and a four-year-old infant holding her hand and walking by her side, went from the Union Depot to Austin street, crossed the railroad tracks, and then took the footpath above described, and followed it on

and across the switch tracks and on until it led her into this hole, into which she fell and received very severe injuries; her left leg was broken, her left ankle dislocated, and she was otherwise hurt.

At the close of the plaintiff's testimony defendant asked an instruction to the effect that plaintiff was not entitled to recover, which the court refused, and exception was taken.

The testimony on the part of defendant tended to show that the condition of the street was not as bad as the testimony for plaintiff indicated, and certain city officials were called, who testified that they did not know of the existence of this hole, never heard of it until after the accident, and in this particular contradicted one of plaintiff's witnesses who had testified that he had previously called the attention of these officials to the hole.

The plaintiff on her cross-examination had testified that in October following the accident, while her leg was yet in the plaster cast and the broken bone not united, she was riding with her husband in a vehicle when a wheel broke down and her broken leg received a jar and the broken joint slipped a little, but that it did not break again. Defendant's testimony on this point tended to prove that she had told the physician, whom she called to examine the injured limb and who took off the old and put on a new plaster cast, that she had broken her leg over again in that buggy accident.

Defendant now insists that the instruction calling for a nonsuit should have been given, first, because there was no legal evidence to show that this was a public street; second, there was no legal evidence to show that the street commissioners, under whose direction the street had been improved, were legal officers of the city, and, third, the plaintiff's own evidence showed that she was guilty of contributory negligence.

The first two of these grounds also appear in the

record in the form of objections to the evidence and also in instructions refused.

1. The evidence on the part of the plaintiff to show that this was a public street which the city was in duty bound to keep in repair, was that it had for many years been used by the public as a street; it had been graded and ditched and sidewalked (with cinders) by the city, under the immediate supervision and direction of the city street commissioner; the city by ordinances had granted the railroad company the license under which the switch tracks had been laid and the culvert constructed, but the evidence did not show an ordinance under which the street commissioner did the work. Appellant now says that in the absence of an ordinance authorizing the work to be done there is no legal evidence that the city assumed jurisdiction over the street or that the city officers were acting within the scope of their duties when they did the work. Appellant relies on Downend v. Kansas City, 156 Mo. 60, to sustain that contention. But appellant does not have the correct conception of that case. The only evidence in that case offered to prove that the alleged street was a public street was that the city council had approved a plat of the proposed addition in which this was shown as a street, and the public had, for a time not specified, made some use of it. There was no evidence that any city officer had taken any authority over it or that any work had been done on it by the city. The court held that the approval of the plat did not impose on the city the duty to take charge of the street, and that the mere user by the public, as shown by the evidence, did not make it a public street which the city was bound to improve or keep in repair. On the contrary, the court in that case refers with approval to Baldwin v. Springfield, 141 Mo. 205, wherein, at page 212, speaking in regard to the obligation of the city to keep the streets in repair, it is said: "The latter obligation does not attach until the corporation, in some official and appro-

priate manner, has invited or sanctioned its use as a street by the public. But such sanction may be given by acts of its proper officers as well as by acts in the form of ordinances.''

See, also, Buschmann v. St. Louis, 121 Mo. l. c. 537.

The acts of the city street commissioners in the case at bar in causing the work of street construction that was done were sufficient to invite the public to use it as a public street and sufficient to justify the finding that it was a public street.

2. The second proposition is that the evidence that these men who at different times occupied the office of street commissioner were street commissioners was incompetent to prove them such. The evidence was that of the men themselves who as witnesses testified that at the several dates mentioned they respectively held the office of street commissioner and did this work in that capacity.

Parol proof that a certain act appertaining to a particular public office was done by a man in possession of the office and acting in the capacity of such officer is competent evidence to show prima facie that the act was official. [Eads v. Wooldridge, 27 Mo. 251.]

3. There is no evidence tending to show that the plaintiff was guilty of contributory negligence. When she landed at the depot at 9 o'clock in the evening she made some inquiry for a vehicle, but none was there. What then could she do other than what she did? Or if, with the assistance of the retrospect, we can now think of something else that she might have done, can we say that what we now see would have been a better course, was then and there so obviously the only prudent thing to do that there can be no doubt about it? As we now see it, it would have been far better if she had sat in the waiting room at the Union Depot all night, but we are not to judge of her acts in the light of the subsequent occurrence, but in that of her then

surroundings. She walked down the street holding one infant in her arms and the other by the hand, trusting, as she had a right to trust, that the city had done its duty in keeping its street in a reasonably safe condition, and thus she walked on in the dark or the dim light until she fell into this pit.

The court did not err in refusing the instruction for a nonsuit.

4. The court refused the following instruction asked by the defendant:

"2. Although the jury may believe from the evidence that plaintiff's injuries are of a permanent character, so as to incapacitate her to enjoy life or cause her to suffer pain, yet if the jury are unable to determine from the testimony whether such injuries are made permanent by the new injury to plaintiff's limb, or the original injury or both injuries combined, then you will not allow any damage on account of said injuries being permanent."

The court at the request of the defendant gave the following instruction:

"10. If the jury should find for the plaintiff, then they should assess only such damages as she sustained on account of her fall in the street on the 17th day of July, 1901, and should not allow damages for any aggravation or increase of said injury caused by plaintiff's neglect of, or imprudence in using, her injured limb, or by any new injury to said limb, if any be shown by the evidence."

These two instructions were aimed at that part of the evidence that related to the alleged second injury to the plaintiff's leg. Whilst it was the duty of the plaintiff to have used reasonable care to promote a recovery, yet if she was guilty of no negligence in this respect and an accident happened to her in which the result was more serious because of her then condition than it would have been if she had not already been

afflicted, such more serious result in reality becomes the result of the first accident. There was nothing to indicate that the plaintiff was imprudent in this respect; the accident occurred by the breaking down of the wheel of the vehicle, but for which there would have been no jar, and but for the already broken and yet ununited bone in her leg the jar would have produced no ill effect. The case does not call for a decision as to whether or not defendant was entitled to instruction numbered 10, which the court gave at defendant's request; therefore, we make no decision on that point. But if the defendant was entitled to have the consequences of that accident subtracted from the consequences of the first injury in the estimation of the damages, it got all that it was entitled to by force of instruction 10. There was no error in refusing instruction numbered 11.

5.    The last insistence is that the damages assessed are excessive.

The testimony showed that the largest bone in the left leg was broken, it was an oblique break, and in consequence the plaintiff had been bedridden the most of the time until the trial, which was ten months after the accident and she was then still suffering and the expert testimony was that it would always give her trouble. Her ankle was also injured. The jury assessed her damages at $3,000, and we see no reason to complain of the award.

There are other points made in the brief of appellant relating to the giving and refusing of instructions but they all come back to rest on the propositions above discussed and we see no' propriety in lengthening out this opinion to discuss the instructions *seriatim*. There is no error in the giving or refusing of instructions of which the defendant has any cause to complain. The judgment is affirmed.

All concur, except *Brace, P. J.,* absent.