Kenneth Wayne TURNER, Plaintiff-Respondent,

v.

YELLOW CAB COMPANY OF SPRINGFIELD, Missouri, and LeRoy Breese, Defendants-Appellants.

No. 7954.

Springfield Court of Appeals.

Missouri.

June 26, 1962.

Motions for Rehearing or to Transfer Overruled July 18, 1962.

Application to Transfer Denied by Supreme Court on Sept. 10, 1962.

Chinn, White & Dickey, Springfield, for defendants-appellants.

Haymes & Haymes, Marshfield, Farrington & Curtis, Springfield, for plaintiff-respondent.

STONE, Judge.

For injuries and damages alleged to have resulted from a vehicular collision on August 21, 1959 (hereinafter referred to as the first accident), plaintiff, Kenneth Wayne Turner, obtained a jury verdict for $5,750. On this appeal from the judgment entered thereon, defendants seek a new trial *on the issue of damages only.* Their complaints are (1) that the verdict was excessive, (2) that it was so excessive as to demonstrate passion and prejudice against defendants and require reversal, and (3) that the trial court prejudicially erred in permitting plaintiff "to introduce evidence of injuries and expenses" in connection with another vehicular collision in which plaintiff was involved on October 3, 1959 (hereinafter referred to as the second accident).

The first accident occurred shortly after midnight on August 21, 1959, in Springfield, Missouri, when a station wagon owned and driven by plaintiff was "bumped from the rear" by a taxicab driven by defendant Breese and operated for defendant, Yellow Cab Company of Springfield. Although both vehicles were moving "very slow," plaintiff said that the impact "wasn't slight" —"it was violent"—"it was a sharp blow"— and that his neck "snapped back" and his head "hit the back of the seat." Alighting from their respective vehicles, the drivers examined the rear end of plaintiff's station wagon, found a dent about the size of a quarter in the left rear bumper guard, and (with defendant Breese agreeing to replace the bumper guard) "decided it wasn't enough to call the police." We note parenthetically that, when plaintiff examined the rear end of his station wagon after his dismissal from the hospital on August 28, 1959, he then found (so he testified) that "the bumper guard was dented, the (rear) bump-

er was sprung, and it showed evidence there of where the bumper had been knocked up against the panel of the car and scraped the paint."

Reverting to plaintiff's account of what had occurred on the night of the first accident, we read that, when he got into his station wagon after he and defendant Breese had inspected its rear end, plaintiff noticed that "the front seat . . . wasn't seated right," but that he proceeded to a coffee shop for a sandwich and coffee before starting for his home in the neighboring city of Marshfield. While in the coffee shop, plaintiff "began to notice a pain in the back of my neck and my head kind of hurt," so he went to the office of the Yellow Cab Company and, failing to find defendant Breese there, located him and the taxicab dispatcher having coffee in a nearby restaurant. At the dispatcher's direction, plaintiff and Breese went to the police station and reported the accident. Then returning to the taxicab office, plaintiff talked over the telephone with a Springfield doctor (called by the dispatcher), who suggested that plaintiff go home that night and come back the next morning. On the way out of Springfield, plaintiff's "neck was hurting worse," so he stopped at a service station and talked over long distance with his family physician at Marshfield who advised him "to turn right around and go back to Burge Hospital and to call Dr. (Erin M.) Dillard." This plaintiff did.

Upon admission to the hospital, plaintiff was given a hypodermic and a sleeping pill; and in the morning Dr. Dillard examined him, arranged for a series of x-rays, made "an x-ray and a clinical diagnosis" of a compression fracture (i. e., a flattening of the body) of the sixth cervical vertebra, and placed him in traction. Within a day or so, plaintiff's back began to hurt and the doctor directed that slats be placed under the mattress. Plaintiff laid on this hard bed in constant pain and in traction, except while receiving therapy treatments, until he was dismissed from the hospital on August 28, one week after his admission. Before dismissal, plaintiff was fitted with a neck brace or neck collar which, at the doctor's direction, he wore until October 3. After further x-ray examination on that date, Dr. Dillard told plaintiff that he was progressing as well as possible and that he should "take the neck brace off for a week or ten days, to see how it got along, and (then) to come back for a recheck."

While driving downtown after leaving the doctor's office on October 3, plaintiff was involved in the second accident when, while stopped at a traffic light, his vehicle again was rear-ended. That impact "was harder" than the impact of the first accident; but, as plaintiff pointed out, he had observed the approaching automobile involved in the second accident before it struck his station wagon and thus was braced for it, whereas he had not seen the taxicab driven by defendant Breese prior to the first accident and accordingly it was unexpected. After reports had been made to investigating police at the scene of the second accident, plaintiff called Dr. Dillard over the telephone and, upon the doctor's advice, re-entered Burge Hospital immediately. Following that period of hospitalization which lasted five days, plaintiff again wore a neck collar "while I was driving" until December 1959. At a time subsequent to the second accident but fixed no more definitely than "along during the winter," Dr. Dillard prescribed a back brace which plaintiff still was wearing when the case was tried on October 13, 1960.

At the time of trial, plaintiff complained of limitation of motion in the neck, "a catch" in his back when he straightened up after bending over, pain both in the neck and in the back, and numbness of both hands. Referring first to the *neck,* Dr. Dillard found "true muscle spasm," which cannot be induced or feigned by a patient, in plaintiff's neck following the first accident. It is apparent from Dr. Dillard's testimony that this muscle spasm had not been completely relieved or entirely eliminated prior to the second accident, for, in discussing his examination of plaintiff at the hospital *after*

the second accident, the doctor said that he had found *"more muscle spasm in his neck than I had found, possibly, that day when he left the office."* (All emphasis herein is ours.) Stoutly supporting his diagnosis of a compression fracture of the sixth cervical vertebra (although conceding that the fracture was "minimal"), Dr. Dillard said that there had been no change in "this abnormality in his (plaintiff's) neck vertebra" during the period from the first accident to the trial, and that this condition will be permanent. According to Dr. Dillard, "there has always been some limitation of movement of the neck ever since (plaintiff's) injury"; and, when counsel probed as to the permanency of this limitation, the answer was that "I would anticipate some loss of motion of the neck, yes." The doctor also "would anticipate some chronic pains in his neck . . . in the future."

Referring to the *back,* Dr. Dillard reported that x-rays of the dorsal and lumbar spine were essentially normal. But, as we have noted, plaintiff (so he said) began to experience pain in his back within a day or so after the first accident; and Dr. Dillard testified that when he saw plaintiff in the doctor's office on September 3, 1959 (six days after dismissal from the hospital), plaintiff complained of pain in his low back and, after undergoing further examination on that date, was advised to restrict "any activities that would aggravate his low back condition." This condition was diagnosed by the doctor as "a low-back strain or a lumbosacral strain . . . a strain-type injury to the muscles and ligaments of the lower back." Dr. Dillard thought that, at the time of trial, plaintiff's "principal disability lies in his neck"; and, although plaintiff then had "continued symptoms in his low back and this would be aggravated by heavy lifting," the doctor attributed to the "ligamentous and muscular strain" of the lower back such "subminimal disability that I feel that he (plaintiff) should make an almost complete recovery from that particular injury."

As for the *numbness of the hands,* plaintiff's testimony was that: "My *hand* has been numb, just like I had slept on *them* all night long, ever since the (first) accident." Complaint concerning this alleged condition was made to Dr. Dillard on September 10, 1959, when (in the doctor's words) "we first noticed numbess of both hands." At the time of trial, the doctor thought that, "as his (plaintiff's) neck establishes itself, that . . . numbness likely will disappear . . . it has been merely an annoying numbness that doesn't prohibit him from doing anything that he wants to do." Plaintiff nevertheless asserted in his testimony that this alleged numbness of the hands was "one reason why I cannot do tedious work," such as repair work on sewing machines and motors in which, among other things, he had been engaged immediately prior to the first accident.

At this point, it may be recorded that, when Dr. D. L. Yancey examined plaintiff at *defendants'* request on June 3, 1960, the doctor found that, "along each trapezius muscle, which is the large muscle that extends from the shoulder up the neck and on each side, he (plaintiff) had some mild degree of tenderness," and that, although anteroposterior motion of the neck was normal, motion was slightly restricted on rotation or turning of the head. Plaintiff then complained of some tenderness in the lumbar area and Dr. Yancey found that "motion was slightly limited when he (plaintiff) would bend forward . . . and on turning to the side, he had a mild amount of restricted motion." Summarizing his findings and testimony, Dr. Yancey was of the opinion that, at the time of his examination on June 3, 1960, plaintiff "had about reached his maximum recovery," but that he still had some symptoms and "would probably have a minimal degree of permanent disability."

The evidence with respect to plaintiff's work and earnings immediately prior to the first accident was (1) that he had sold sewing machines for Singer and, in that sales work, had earned an average of $168.-

77 per month, (2) that for "sewing machine service" he had earned more than $100 per month, and (3) that he had operated a store at Marshfield for Ellis Brown, in which employment he had assembled, handled, sold and serviced such articles as chain saws, garden tractors, boats and outboard motors, and from which he had earned an average of $194.45 per month under a profit-sharing agreement. Thus, plaintiff's aggregate earnings immediately prior to the first accident had averaged $463.22 per month. Dr. Dillard's opinion as to whether or when plaintiff might have been physically able to have returned to any of his former employments was neither sought nor given. However, plaintiff testified, *without objection,* that he quit all of those employments immediately after the first accident because: "I was limited to what I could do. I couldn't lift. The doctor advised me not to do any lifting. And then the way my hands are now, I can't do tedious work which sewing machine repair work requires . . ." For a brief period prior to November 11, 1959 (beginning on a date not determinable from the record), plaintiff worked as a life insurance agent but that ill-advised, sterile career came to an early end because (as plaintiff put it) "I found I could not sell intangible merchandise." After November 11, 1959, plaintiff traveled for a school supply firm, selling school maps in the western half of Missouri. His net income for the remainder of 1959 (after the first accident) was $104.90 and for the first nine months of 1960 (the case was tried on October 13) was $1,859.37.

In defendants' original brief, the emphasis was upon the alleged excessiveness of the verdict. However, in the orderly review of defendants' appellate complaints, it would seem to be appropriate to rule first the point alleging that the trial court prejudicially erred in permitting plaintiff "to introduce evidence of injuries and expenses" in connection with the second accident, since, if that point were well-taken, it would necessitate retrial. As particularly pertinent in consideration of this point, certain additional evidence is noted. In response to a hypothetical question seeking his opinion *whether "the fracture of plaintiff's neck, the pain in his back and the numbness in his hands . . . have been caused by or resulted from"* the first accident, Dr. Dillard said, *"Yes, sir, it is my feeling that these injuries did occur from that accident."* And, when asked whether "the conditions that he complains of *now* with reference to limitation of the motion of the neck, of pain in his back, and numbness of his hands" resulted from the first accident or the second accident, the doctor replied, *"Well, I would say all of these symptoms were present, according to my records and according to my recollection, as a result of the injuries sustained on the 21st of August; all these symptoms were present at that time, and continued through . . . the 3rd of October."* In this connection, see Long v. St. Louis Public Service Co., Mo.App., 288 S.W.2d 417, 424–427, a second accident case.

On direct examination, *plaintiff* testified that "the pain in my neck and the pain in my back has been the same" since the first accident; and, to the question, "how soon was it (after the second accident) that you were back in the same condition that you were prior to that accident," plaintiff answered, "when he (Dr. Dillard) dismissed me from the hospital after five days . . . he said, 'Well, the x-rays shows that there is nothing new that has happened . . . go ahead as you were.'" On cross-examination, the question by *defendants'* counsel, "do you feel that you had any injury at all, as a result of (the second) accident," evoked this bit of hearsay, "the doctor said there was nothing new"; and when confronted with the query, "will you represent to the jury . . . that everything that is the matter with you *now,* . . . was the result of the taxicab hitting you (the first accident), and was in no way connected with the October 3rd (second) accident," plaintiff responded, "that is true." Regardless of whether the quoted hearsay and conclusion testimony might

have been excluded on timely and appropriate objections or motions to strike, its probative worth and effect were for the jury since it was received without such objection or motion. Appelhans v. Goldman, Mo., 349 S.W.2d 204, 207(5, 6); Edmisten v. Dousette, Mo.App., 334 S.W.2d 746, 753, and cases collected in footnote 13; Lomax v. Sawtell, Mo.App., 286 S.W.2d 40, 42(1); Vosburg v. Smith, Mo.App., 272 S.W.2d 297, 302(9).

We find the statement in defendants' original brief that "the plaintiff was injured (if he was injured at all) as a result of the second accident"; and, taking the record as a whole, it appears that defendants' counsel assumed the calculated trial risk of boldly (and, we may add, capably) presenting the case to the jury on that theory. But, *if* the evidence would have permitted a finding for defendants on that theory, certainly it did not compel any such finding. On the contrary, it is clear that, from the evidence heretofore reviewed, the jury reasonably could have found not only that plaintiff had sustained personal injuries in and as a result of the first accident but also (more importantly insofar as the point under discussion is concerned) that, when the second accident occurred, plaintiff had neither recovered fully nor attained the maximum degree of ultimate recovery from injuries sustained in the first accident, and that a substantial portion of plaintiff's disability and damage subsequent to the date of the second accident would have been sustained even if that accident had not occurred.

■ Of course, this is *not* a case in which instant defendants, as the tort-feasors in the first accident, may be held for injuries sustained by plaintiff in the second accident on the theory that such accident occurred by reason of a weakened member or impaired physical condition resulting from the first accident. Contrast Creech v. Riss & Co., Mo., 285 S.W.2d 554, 560–561; Bowyer v. Te-Co, Inc., Mo., 310 S.W.2d 892,

900. But, although not liable for loss resulting from an intervening cause or not shown to be a proximate consequence of his wrong, a tort-feasor is liable to an injured person for all natural and proximate consequences of his wrongful act or omission [Creech v. Riss & Co., supra, 285 S.W.2d loc. cit. 561 (4, 5)]; and, in practical and logical application of this broad underlying principle, it would seem to be plain beyond reasonable room for argument that instant defendants would remain liable for, and properly might be charged with, such disability and damage subsequent to the date of the second accident as plaintiff would have sustained anyway even if the second accident had not occurred.

■■ The general rule is that, where a plaintiff may have suffered disability and damage from two different causes, it is peculiarly within the province of the jury to apportion the disability and damage to the respective causes. Belisle v. Wilson, Mo., 313 S.W.2d 11, 18; Thompson v. Healzer Cartage Co., Mo., 287 S.W.2d 791, 794(8); Mathew v. Wabash Ry. Co., 115 Mo.App. 468, 474, 78 S.W. 271, 272, 81 S.W. 646. So, the jury in the instant case was charged with the inescapable duty of determining what portion (if any) of plaintiff's alleged disability and damage subsequent to the date of the second accident was the result of, and thus allocable to, the first accident for which defendants were liable, and what portion thereof was the result of, and thus allocable to, the second accident for which they were not liable. Delicate and difficult as that determination obviously was, the jury needed and was entitled to have all available competent evidence which would shed light upon this vexing problem, including evidence concerning the second accident and plaintiff's condition thereafter. Papic v. Freund, Mo.App., 181 S.W. 1161, 1163–1164; Powers v. Kansas City, 224 Mo.App. 70, 80–81(4), 18 S.W.2d 545, 551(4, 7); Croak v. Croak, Mo.App., 33 S.W.2d 998, 1001(5).[1] See again Long v. St. Louis Pub-

1. In Powers v. Kansas City, 224 Mo.App. 70, 18 S.W.2d 545, and in Croak v. Croak, Mo.App., 33 S.W.2d 998, the first accident had resulted in a weakened leg

lic Service Co., supra, 288 S.W.2d loc. cit. 424–427. We hasten to add that, since the second accident was caused by an external force wholly unrelated to plaintiff or his physical condition, the jury should have been instructed, substantially as it was by defendants' given instruction 5, that *"the burden is upon plaintiff to prove by the preponderance or greater weight of the credible evidence that his injuries, if any, were sustained as a result of the accident of August 21, 1959, and you may consider only such injury and damage, if any, as naturally resulted to plaintiff from the collision of August 21, 1959, and you may not consider any additional injuries, damages, or aggravation of existing injuries, if any, which plaintiff may have sustained as a result of an accident or collision, if any, subsequent to the collision (of) August 21, 1959."*

■ Absent any evidence from which it reasonably might have been found that plaintiff's hospitalization and medical treatment *immediately following the second accident* were the natural and proximate consequences of the first accident, plaintiff should not have been permitted to show *the*

*amounts of the additional hospital and medical expenses then incurred.* Also, we have not overlooked the fact that, when defendants' counsel belatedly interposed their *initial* objection "to any evidence as to what happened following the second collision" after a series of eight questions already had been asked and answered in this evidential area, plaintiff's counsel interjected the strange and self-contradictory comment that "the medical testimony will be that . . . all of this was from the first injury and it was simply an aggravation of the first injury." However, we also have in mind that the court subsequently gave the above-quoted instruction 5.

■ It has long been the rule that, save in exceptional circumstances,[2] it is sufficient to give an instruction withdrawing or directing the jury to disregard evidence improperly admitted, the presumption being that the jury followed the court's direction;[3] and some of the cases suggest that this rule is particularly applicable where (as in the instant case) there has been no motion for a mistrial.[4] Although instant defendants' instruction 5 was not

which thereafter had caused plaintiff to fall and sustain further injury; and, in each case, it was held that the second accident (a fall) had been the intervening and efficient cause of a new injury, which could not have been a natural and proximate consequence of the first accident. *On this point*, both cases were disapproved in Creech v. Riss & Co., Mo., 285 S.W.2d 554, 561, and in Bowyer v. Te-Co, Inc., Mo., 310 S.W.2d 892, 900, where, in each instance, the Supreme Court held that the jury reasonably could have found that the second accident and attendant injuries were natural and proximate consequences of the first accident. But, we do not view those holdings as in any wise assailing the logic or weakening the authority of Powers and Croak, supra, *on the point under discussion here.*

2. E. g., City of Gallatin v. Murphy, Mo. App., 217 S.W.2d 400, 408–409(14); National Cash Register Co. v. Kay, Mo. App., 119 S.W.2d 437; Chenoweth v. Sutherland, 141 Mo.App. 272, 124 S.W. 1055.

3. Evans v. Missouri Pac. R. Co., 342 Mo. 420, 426(4), 116 S.W.2d 8, 10(4, 5); Stith v. J. J. Newberry Co., 336 Mo. 467, 487(10), 79 S.W.2d 447, 456–457(22); Grott v. Johnson, Stephens & Shinkle Shoe Co., Mo., 2 S.W.2d 785, 787–788(1, 2); Harrison v. Kansas City Elec. Light Co., 195 Mo. 606, 635, 93 S.W. 951, 960 (6), 7 L.R.A.(N.S.) 293; Moses v. Kansas City Public Service Co., 239 Mo.App. 361, 375, 188 S.W.2d 538, 546(12, 13); Hanson v. City Light & Traction Co., 238 Mo.App. 182, 199(12), 178 S.W.2d 804, 812(12); Karst v. Chicago Fraternal Life Ass'n., Mo.App., 40 S.W.2d 732, 735–736(3, 4), certiorari denied 284 U.S. 694, 52 S.Ct. 40, 76 L.Ed. 562; McCarter v. Burger, Mo.App., 6 S.W.2d 979, 981(4).

4. Moses v. Kansas City Public Service Co., supra, 239 Mo.App. loc. cit. 376, 188 S.W. 2d loc. cit. 546–547; Hanson v. City Light & Traction Co., supra, 238 Mo.App. loc. cit. 200, 178 S.W.2d loc. cit. 812. See also Stith v. J. J. Newberry Co., supra, 336 Mo. loc. cit. 487, 79 S.W.2d loc. cit. 457; 5A C.J.S. Appeal and Error § 1737b, loc. cit. 1053. Contrast City of

explicitly a withdrawal instruction, it served that purpose and function. Cf. State ex rel. State Highway Commission v. Young, 324 Mo. 277, 287(8), 23 S.W.2d 130, 134(7); Gold v. S. Pian Time Payment Jewelry Co., 165 Mo.App. 154, 164(5), 145 S.W. 1174, 1177(3). Furthermore, our Missouri cases demonstrate that error in the admission of evidence pertaining to damages usually is regarded as cured or as not prejudicial, where the court's instructions on the measure of damages are proper and exclude the items on which evidence has been admitted improperly.[5] With no appellate attack leveled at instant plaintiff's instruction 2 on the measure of damages, with the above-quoted defendants' instruction 5 having been given, and with most of the evidence pertaining to the second accident and plaintiff's subsequent condition properly in the record anyway, meticulous examination of the transcript before us impels the considered conclusion that there are no such "exceptional circumstances" in this case as would take it beyond the control of the general principles hereinbefore discussed and that, for improper admission of relatively minor and unimportant fragments of evidence, we may not find, as is prerequisite to our reversal of the judgment, that "error was committed by the trial court . . . materially affecting the merits of the action." Rule 83.13(b), V.A.M.R.; V.A.M.S. § 512.-160(2).

■ We turn to defendants' contention that the verdict was excessive. Although an appellate court properly may determine, as a matter of law, whether the verdict under review is in excess of the maximum amount which the evidence in the case would support [Sanders v. Illinois Cent. R. Co., 364 Mo. 1010, 1018, 1019,

270 S.W.2d 731, 737(5), 738(8); Fann v. Farmer, Mo.App., 289 S.W.2d 144, 150 (14)], the assessment of damages is peculiarly and primarily the function of the jury, whose duty it is to award such sum as reasonably will compensate plaintiff [Breland v. Gulf, Mobile & Ohio R. Co., Mo., 325 S.W.2d 9, 15(5); Conley v. Berberich, Mo.App., 300 S.W.2d 844, 850(12)]; and, the appellate power to interfere with and reduce a verdict is exercised with caution [Silsby v. Hinchey, Mo.App., 107 S.W. 2d 812, 819(22); Stofer v. Kansas City Public Service Co., 226 Mo.App. 376, 388, 41 S.W.2d 614, 620(11)] and only where the amount of the verdict is manifestly unjust. Breland, supra, 325 S.W.2d loc. cit. 16. In determining whether a verdict is excessive, we do not weigh the evidence [Grimm v. Gargis, Mo., 303 S.W.2d 43, 52–53(16), 74 A.L.R.2d 599; Pierce v. New York Cent. R. Co., Mo., 257 S.W.2d 84, 90(11)] but consider it in the light most favorable to plaintiff and the verdict, disregarding defendants' contradictory or unfavorable evidence. Morgan v. Thompson, Mo., 325 S.W.2d 794, 798(3); Riggs v. Metcalf, Mo., 315 S.W.2d 791, 796(6); Lange v. St. Louis Public Service Co., 361 Mo. 74, 233 S.W.2d 641, 642(3).

■ Obviously, the maximum award permissible under the evidence in a given case is not susceptible of determination by precise formula or with mathematical nicety; and, since no two cases are exactly alike, each must be ruled on its own particular facts. Erbes v. Union Electric Co., Mo., 353 S.W.2d 659, 670; Carnes v. Kansas City Southern Ry. Co., Mo., 328 S.W. 2d 615, 623. "Consideration is given to the nature and extent of the injuries and disabilities, diminished earning capacity, changing economic factors and the com-

Gallatin v. Murphy, supra, 217 S.W.2d loc. cit. 408, and National Cash Register Co. v. Kay, supra, 119 S.W.2d loc. cit. 439, where motions for mistrial were made and denied.

5. Hamilton v. Kansas City Rys. Co., Mo. App., 239 S.W. 164, 165(4); Kolkmeyer

v. Chicago & A. R. Co., 192 Mo.App. 188, 198, 182 S.W. 794, 798(8). Consult also Heppner v. Atchison, T. & S. F. Ry. Co., Mo., 297 S.W.2d 497, 508(14); Funke v. St. Louis-San Francisco Ry. Co., 225 Mo.App. 347, 355, 35 S.W.2d 977, 981(7); Shannon v. People's Motorbus Co., Mo. App., 20 S.W.2d 580, 582(3).

pensation awarded and approved in cases of similar or fairly comparable injuries" [Rodefeld v. St. Louis Public Service Co., Mo., 275 S.W.2d 256, 262(11); Fann, supra, 289 S.W.2d loc. cit. 150(16)]; and due regard is accorded to the significant decline in the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries, to the fact that the jury and the trial court had adequate opportunity to make a personal appraisement of plaintiff's true condition and thus were in better position than the appellate court to measure an award of reasonable compensation, and to approval of the verdict by the trial court upon motion for new trial. Hunter v. St. Louis Southwestern Ry. Co., Mo., 315 S.W.2d 689, 697(10); Kiger v. Terminal R. Ass'n of St. Louis, Mo., 311 S.W.2d 5, 15(19); Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127(6).

With all of these important considerations in mind, we have read and reread the transcript and have sifted and resifted the facts, hereinbefore reported in inordinate detail. Conceding that the jury was generous in its award, we may not, for that reason alone, interfere with the verdict. Smith v. St. Louis Public Service Co., Mo.App., 235 S.W.2d 102, 106(8); Arl v. St. Louis Public Service Co., Mo. App., 243 S.W.2d 797, 800(6). With plaintiff's evidence sufficient to have permitted a finding that he suffered a substantial loss of income by reason of injuries sustained in the first accident,[6] we are unable to say that the verdict was manifestly excessive. Numerous cases supporting, and we think compelling, this conclusion are listed marginally.[7] Without further prolonging this opinion by detailed discussion of the three cases[8] upon which instant defendants primarily rest their claim of excessiveness, it will suffice to suggest with respect to two of those cases [Ulmer v. Farnham, Mo. App., 28 S.W.2d 113 (1930), and Brooks v. McCray, Mo.App., 145 S.W.2d 985 (1940)], as did the St. Louis Court of Appeals in Crosby v. St. Louis County Cab Co., Mo. App., 320 S.W.2d 944, 950, that "(t)he value of the dollar has decreased materially since those cases were decided and they are of little help today for purpose of comparison," and to observe with respect to all three cases that the injuries and damages *which the jury reasonably might have found instant plaintiff to have sustained* were, in our judgment, more serious than in those cases.

The judgment is affirmed.

RUARK, P. J., concurs.

McDOWELL, J., dissents.

6. Hampton v. Rautenstrauch, Mo., 338 S.W. 2d 105, 109; Daniels v. Banning, Mo., 329 S.W.2d 647, 654–655; Belding v. St. Louis Public Service Co., 358 Mo. 491, 215 S.W.2d 506, 512. See also Howerton v. Railway Express Agency, 361 Mo. 564, 235 S.W.2d 250, 254.

7. McSkimming v. St. Louis Public Service Co., Mo.App., 257 S.W.2d 176, 180 (6); Salzwedel v. Vassil, Mo.App., 351 S.W.2d 829, 838(8); Daniels v. Banning, supra, 329 S.W.2d loc. cit. 654–655; Smith v. St. Louis Public Service Co., Mo.App., 235 S.W.2d 102; Davis v. Kansas City Public Service Co., 361 Mo. 61,

233 S.W.2d 679, 685(9); Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348, 354(13); Long v. St. Louis Public Service Co., Mo.App., 288 S.W.2d 417; Arl v. St. Louis Public Service Co., Mo.App., 243 S.W.2d 797; Baker v. Kansas City Terminal Ry. Co., Mo., 250 S.W.2d 999, 1006–1007; Harvey v. Gardner, 359 Mo. 730, 223 S.W.2d 428, 433(11).

8. McBride v. Clarida, Mo.App., 254 S.W. 2d 36; Brooks v. McCray, Mo.App., 145 S.W.2d 985; Ulmer v. Farnham, Mo.App., 28 S.W.2d 113.